UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 01-1284(DSD/SRN)

Encore Technologies, L.L.C.,

Plaintiff,

v. **ORDER**

Eco Soil Systems, Inc.,

Defendant,

Jeffrey E. Grell, Esq. and Leonard, Street & Deinard, 150 Fifth Street South, Suite 2300, Minneapolis, MN 55402, counsel for plaintiff.

George O. Ludcke, Esq., Erin Fogarty-Lisle, Esq. and Kelly & Berens, 3720 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402 and Peter H. Benzian, Esq. and Latham & Watkins, 701 B Street, Suite 2100, San Diego, CA 92101-8197, counsel for defendant.

This matter is before the court on plaintiff Encore Technologies, L.L.C.'s ("Encore") motion for summary judgment [Docket No. 13] on count 1 of its complaint and counts 1 and 2 of the answer and counterclaim filed by defendant Eco Soil Systems, Inc. ("Eco Soil"). For the following reasons, the court will grant plaintiff's motion for summary judgment and will dismiss defendant's counterclaim with prejudice.

JUL 2 2002
FILED
RICHARD D. SLETTEN, CLERK
Judgment Ent'd.
Deputy Clerk's Initials

## BACKGROUND

Encore produces biological products including a turf enhancement product known as Azo. Azo is the common name for *azospirillum brasilense* CD which is a plant enhancement chemical that stimulates root growth in grasses. Eco Soil is a distributor of biological products and has distributed Azo for a number of years.[1] The current dispute arises out of contract for Encore to produce and Eco Soil to distribute Azo in 2001.

Throughout the fall of 2000, the parties attempted to negotiate the terms of Eco Soil's distribution of Azo but were unsuccessful in negotiating an exclusivity agreement.[2] Despite

---

[1] For example, in 1995 Eco Soil began purchasing Azo from Encore for use in defendant's on-site injection system. In 1997, the parties entered into a three-year license and supply agreement. Among the terms of this agreement was an exclusivity agreement between the parties.

[2] After the 1997 three-year exclusive licensing agreement expired in February, 2000, the parties attempted to negotiate another exclusivity agreement for the distribution of Azo. For example, on September 22, 2000, Encore sent Eco Soil a letter containing proposed terms and conditions for the supply of Azo in the year 2001. Encore offered a pricing schedule based upon an exclusive distributorship of Azo for turf use in 2001. Encore's offer was also conditioned upon a payment guarantee from Eco Soil because Encore was concerned about Eco Soil's ability to make payments for the Azo. No agreement was reached in response to this letter. Eco Soil sent a memorandum to Encore dated October 6, 2000, proposing that the parties meet to consider a longer term exclusive distributorship for Azo. In November 2000, Eco Soil president and chief operating officer, Max Gelwix, and Eco Soil's vice president met with David Goulet, president of Encore, to negotiate an exclusive arrangement for the distribution of Azo. Eco Soil continued to negotiate with Encore throughout December and January. Despite these negotiations, Encore and Eco Soil were (continued...)

their inability to reach an agreement regarding the long-term exclusive distributorship for Azo, the parties did reach an agreement for the distribution of Azo for the year 2001. In February 2001, Eco Soil issued to Encore an irrevocable purchase order for 10,000 gallons of Azo at $48.50 per gallon. Encore accepted Eco Soil's purchase order on the condition that Eco Soil prepay for all shipments of Azo. Eco Soil accepted Encore's prepayment condition and Encore began to produce Azo under Eco Soil's purchase order. Eco Soil advanced some payments to Encore, and in return, Encore produced and shipped Azo in anticipation of its obligations under the purchase order.

While Encore continued to produce Azo, Eco Soil failed to fulfill its obligations under the purchase order. Beginning in March 2001, Eco Soil stopped making timely payments for Azo. By the end of March 2001, Encore had produced more than 3,000 additional gallons of Azo in anticipation of meeting its obligations to Eco Soil. In March and April 2001, Encore received $57,084.50 to be applied to Eco Soil's purchase order for Azo. Despite repeated demands, Eco Soil failed to make any further payments under the 2001 purchase order.

In an effort to mitigate its damages, Encore contacted Eco Soil's primary customer, Simplot Partners ("Simplot"), to discuss

---

[2](...continued)
unable to agree to an exclusive distributorship.

options to make Azo directly available to Simplot. On March 30, 2001, in response to a letter from Eco Soil regarding Encore's communication with Simplot, Encore suggested that Encore and Eco Soil meet with Simplot to discuss what arrangements could be made to make the product available to all three companies. No proposal was made or met. Encore never sold Azo to Simplot partners or to any other customer of Eco Soil. After some months, plaintiff asserted that the Azo it had produced for Eco Soil that had not been shipped had exceeded its viability and could not be resold.

Encore brought suit for breach of contract and Eco Soil counterclaimed alleging breach of a purported exclusivity agreement between the parties and tortious interference with contract. For the following reasons, the court will grant plaintiff's motion for summary judgment.

## DISCUSSION

### A. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c). A fact is material only when its resolution affects the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 250. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. See id. at 322-23.

With this standard at hand, the court considers defendant's motion.

**B. Encore is Entitled to Summary Judgment on Count 1 of its Complaint**

The construction and effect of a contract are questions of law for the court to decide. See Affiliated Bank Group, Ltd. v. Zehringer, 527 N.W.2d 584, 587-88 (Minn. Ct. App. 1995). Whether

or not a contract term is ambiguous is also a question of law. Lehman Bros. v. Clark Oil & Refining Corp., 739 F.2d 1313, 1317 (8th Cir. 1984). Extrinsic evidence is not relevant for determining the existence of ambiguity. St. Louis Union Trust Co. v. U.S., 617 F.2d 1293, 1300 (8th Cir. 1980). A contract term is ambiguous if it is reasonably susceptible to more than one construction. Erhahardt v. Penn. Mut. Life Ins. Co., 902 F.2d 664, 667 (8th Cir. 1990). If a contract term is determined to be unambiguous, its interpretation is a question of law. Cooper v. Lakewood Eng'g & Mfg. Co., 874 F. Supp. 947, 953 (D. Minn. 1994).

The contract between Encore and Eco Soil for the sale and purchase of Azo in 2001 is straightforward and unambiguous. Eco Soil agreed to purchase 10,000 gallons of Azo from Encore for $48.50 per gallon, and in exchange, Encore agreed to produce 10,000 gallons of Azo for Eco Soil in 2001. By failing to pay for the Azo it ordered, Eco Soil breached its contract with Encore. Therefore, Encore is entitled to summary judgment as a matter of law on its breach of contract claim against Eco Soil as pleaded in Count 1 of Encore's complaint.

Moreover, the court sees no basis supporting defendant's assertion that there was an exclusivity agreement between the parties in 2001. After carefully reviewing the undisputed evidentiary record, the court sees no reference or inclusion of an exclusivity provision in the 2001 agreement. While defendant

attempts to base its assertion of the existence of an exclusivity agreement on the terms of the 1997 agreement, the court concludes that the 1997 agreement expired in February 2000 by its own terms.[3] Defendant does not set forth any persuasive evidence to counter the clear termination language of the 1997 agreement or to support its assertion that this exclusivity agreement was revived after its termination or created some type of "perpetual exclusivity" for defendant. (See Def.'s Mem. at 3-4.) In sum, while the issue of exclusivity may have been negotiated between the parties prior to the 2001 agreement, it is clear from the record that the parties never reached a final agreement on an exclusivity arrangement in 2001. See 451 Corp. v. Pension Sys., 310 N.W.2d 922, 924 (Minn. 1981) (mere negotiations do not constitute a contract).[4]

---

[3] The termination provision of the 1997 License and Supply Agreement unambiguously states:

> Encore shall have no obligation to produce or sell to Eco Soil any [Azo or other products] requested by Eco Soil ... after the end of the Third Contract Year. Similarly, Eco Soil shall have no obligation hereunder to provide any additional profit payments with respect to any Contract Year after the Third Contract Year.

Eco Soil's assertion that the purported exclusivity agreement remained in effect after February 2000, the end of the third contract year, contradicts the clear and unambiguous language of the 1997 agreement.

[4] The court also notes that the fact that the parties were again attempting to negotiate an exclusivity agreement in late 2000 and early 2001 fails to support defendant's assertion that it had (continued...)

Moreover, the parties' correspondence in February 2001 expressly supports the determination that no exclusivity agreement was in existence in 2001. For example, in letter dated February 2, 2001, Max D. Gelwix, President of Eco Soil, writes to Dave Goulet, President of Encore, "I am disappointed that we were unable to come to terms on a long-term exclusive relationship." (Goulet Aff. Ex. G.) Similarly, in a letter dated February 22, 2001, Goulet writes to Gelwix:

> [a]s a follow-up to our last several telephone calls and your letter ... we were unable to agree to terms for exclusivity for Eco Soil on Encore's Azo product. However, we did agree that Encore would provide Eco Soil with Azo based on the sale conditions that Eco Soil would provide a non-cancelable (sic) purchase order for your needs for the 2001 season ... Encore will provide the Azo product as agreed upon to Eco Soil provided Eco Soil maintains a good business relationship, which includes prompt payments.

(Goulet Aff. Ex. K.)[5]

Where the words of a contract are plain and unambiguous, the court must uphold the plainly expressed intent of the parties. See

---

[4](...continued) "obtain[ed] perpetual exclusivity over the sale of AZO" pursuant to the 1997 license agreement. (See Def.'s Mem. at 3-4.)

[5] On February 7, 2001, Eco Soil sent Encore the 2001 Purchase Order for Azo, which stated that it was an "irrevocable purchase order #1130 for 10,000 gallons of AZO Special" at the price of $48.50 per gallon. Two days later, Eco Soil sent Encore a Lot Release form referencing the 2001 purchase order and providing release dates for specific quantities of Azo. The lot release similarly does not mention or include an exclusivity agreement.

Carl Bolander & Sons v. United Stockyards Corp., 215 N.W.2d 473, 476 (Minn. 1974). Accordingly, and after carefully reviewing the contract, the court believes plaintiff is entitled to summary judgment on its claim of breach.

**C. Encore is Entitled to Summary Judgment on Eco Soil's Counterclaim**

Defendant asserts in its counterclaim that the contract between plaintiff and defendant included an "exclusive, royalty free, perpetual license to resell AZO to its customers and that Encore would not attempt to sell such product to such customers or others." (Def.'s Answer and Counterclaim ¶ 10.) Defendant also asserts that plaintiff breached this alleged exclusive license agreement by attempting to sell Azo to Eco Soil's customers and potential customers. Plaintiff counters that defendant has no basis to assert a claim of breach against plaintiff since no such agreement existed in 2001. Moreover, plaintiff contends that since no exclusive license agreement was in place, defendant cannot argue that it was justified in breaching the contract between the parties by failing to make the payments for the Azo it had ordered under the February 2001 purchase order.

After careful consideration, the court agrees with the position of plaintiff. As has been discussed above, any exclusivity arrangement arising under the 1997 contract expired in February 2000, and the court can find no new exclusivity agreement in the unambiguous terms of the February 2001 contract. Mutual

assent of parties is a fundamental element for the formation of a contract. Lake Co. v. Molan, 131 N.W.2d 734, 739 (Minn. 1964). Whether a contract is formed is judged objectively by the conduct of parties, not by their subjective intent. Cedarstrand v. Lutheran Brotherhood, 117 N.W.2d 213, 221 (Minn. 1962). Because defendant fails to set forth any evidence showing that the parties came to an agreement for the exclusive distribution of Azo in 2001, the court will dismiss defendant's breach of contract claim.

The court also concludes that plaintiff is entitled to summary judgment on Count 2 of defendant's counterclaim since defendant fails to make a prima facie case for interference with contract. Tortious interference with contract requires proof of: (1) the existence of a contract; (2) knowledge of the contract by the alleged wrongdoer; (3) intentional procurement of its breach; (4) no justification for the interference; and (5) damages resulting therefrom. Midwest Sports Marketing, Inc. v. Hillerich & Bradsby of Canada, Ltd., 552 N.W.2d 254, 267 (Minn. Ct. App. 1996).

In light of the undisputed facts and defendant's breach, the court believes that plaintiff was justified in contacting Simplot. That is, given defendant's failure to fulfill its obligations under the February 2001 purchase agreement, and when taking into account the limited shelf life of Azo, Encore was not only justified but obligated to mitigate damages by attempting to sell the product to

another purchaser. See Deutz-Allis Credit Corp. v. Jensen, 458 N.W.2d 163, 166 (Minn. Ct. App. 1990) ("It is a well-settled principle of contract law that a non-breaching party is duty-bound to use reasonable diligence to mitigate damages.").[6]

Defendant's counterclaims thus fail and will be dismissed with prejudice.

## CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment is granted;

2. Judgment in this matter is entered in favor of plaintiff as to count 1 of plaintiff's complaint; and

3. Defendant's counterclaim, counts 1 and 2, are dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 1, 2002

David S. Doty, Judge
United States District Court

[6] Moreover, since the record adequately reflects that Encore's sales overtures to Simplot were unsuccessful, defendant also fails to make a showing that it suffered any damage from Encore merely contacting Simplot to offer to sell it Azo directly.

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

**DATE MAILED TO COUNSEL/PRO SE PARTIES:**

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

*This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.*

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.